**ALGOMA COAL & COKE CO. et al. v. UNITED STATES et al.**

No. 337.

District Court, E. D. Virginia.

July 6, 1935.

488

E. L. Greever, of Tazewell, Va., and R. E. Quirk and J. V. Norman, both of Washington, D. C., for plaintiffs.

Elmer B. Collins, Sp. Asst. to the Atty. Gen., for the United States.

J. Stanley Payne, of Washington, D. C., for Interstate Commerce Commission.

R. V. Fletcher, of Chicago, Ill., R. W. Barrett, of New York City, Guernsey Orcutt, of Pittsburgh, Pa., T. P. Healy, of New York City, M. Carter Hall, of Richmond, Va., F. G. Dorety, of St. Paul, Minn., J. M. Souby, of Omaha, Neb., M. G. Roberts, of St. Louis, Mo., J. R. Bell, of Washington, D. C., H. H. Larimore, of St. Louis, Mo., W. A. Northcutt, of Louisville, Ky., W. N. McGehee and F. W. Gwathmey, both of Washington, D. C., Elmer A. Smith, of Chicago, Ill., J. Carter Fort, George H. Gardner, D. Lynch Younger, and John C. Donnally, all of Washington, D. C., and W. H. T. Loyall, of Norfolk, Va., for the railroads, as defendants and interveners.

Before SOPER, Circuit Judge, and WAY and CHESNUT, District Judges.

CHESNUT, District Judge.

This is a proceeding in equity under the authority of the Act of Congress of October 22, 1913, known as the Urgent Deficiencies Appropriation Act (U. S. C., title 28, § 41 (28), 43–48, 28 USCA §§ 41 (28), 43–48), to enjoin, suspend, set aside, and annul orders of the Interstate Commerce Commission made and entered on March 26, 1935, in a proceeding described as "Emergency Freight Charges, 1935, Ex parte No. 115" (208 I. C. C. 4). The plaintiffs are 179

corporations engaged in the business of mining coal in the states of Virginia, West Virginia, Kentucky, and Tennessee, which is shipped in interstate commerce. As required by the statute, a three-judge court was constituted by order dated April 12, 1935, and the plaintiffs' application for an interlocutory injunction was set for hearing at Richmond, Va., on April 17, 1935. After the hearing on that day an order was entered denying the application for a preliminary injunction. Thereupon by stipulation of counsel the case was also submitted for final decree on the petition of the plaintiffs and the answers of the respective defendants, together with certain affidavits submitted by the parties.

The original defendants in the case, in addition to the United States and the Interstate Commerce Commission, were four railroad corporations on which shipments from the plaintiffs' coal mines originate for carriage in interstate commerce. Other railroad companies have been made parties defendant to the case as intervenors. Extended briefs have been submitted by counsel for the respective parties.

Upon further consideration of the case presented, we are of the opinion that the bill of complaint must be dismissed. The reasons for this conclusion follow.

In the Commission Case referred to (Emergency Freight Charges, 1935, Ex parte No. 115) the Commission dealt with a petition filed with it on August 27, 1934, on behalf of substantially all the Class I railroad carriers in the continental United States which sought authority to make certain increases of a general nature in their freight rates and charges, to meet in part increased expenses of operation, caused by an increased wage scale and rising cost of materials and supplies, estimated to be $293,000,000 annually, which, it was represented, would so affect net railway operating income as to jeopardize the solvency of a large portion of the railway systems. The railroads disclaimed any attempt to increase rates to an amount necessary to yield a fair return. Their objective was stated as follows: "They are seeking in this proceeding only such reasonable increase in their freight rates and charges as will, taking into consideration the effect of such increase on the movement of traffic, increase their revenues and thus enable them to meet, in part, the increases in their operating expenses chargeable to the increases in the level of wages of railroad labor and in the unit price of materials and supplies, which increases in operation expenses but reflect the economic policies of the government."

In their petition the railroads did not ask for a general horizontal change in the rate level by applying a uniform percentage increase, but did ask for increases on a selective basis. In general, an increase of 10 per cent. in existing rates was proposed, subject to certain maxima and exceptions, and the subjecting of certain commodities to increases of flat amounts instead of percentages, with exception of others from any increases. To avoid the most acute truck competition, increases were proposed in certain cases only for the longer hauls. It was estimated that the rate changes proposed would increase revenues by approximately $170,000,000 a year, assuming that intrastate rates would be similarly increased. The prayer of the petition was that the Commission find the proposed rates to be just and reasonable and permit tariffs based thereon to become effective without suspension, together with other necessary relief of a technical nature under sections 4 and 6 of the Interstate Commerce Act (49 USCA §§ 4, 6), including the modification of all outstanding orders prescribing rates or relation of rates, so far as necessary to permit the increases to be made effective.

Extensive hearings were held by the Commission at various times and at various places beginning October 1, 1934, and continuing until the testimony was closed early in December, 1934. A committee representing state commissions sat with the Interstate Commerce Commission at the hearings and during oral arguments and conferred with the federal body. The testimony taken exceeded 8,000 pages. The evidence offered by the carriers was principally devoted to statistical data dealing with the financial results of their operations in recent years. The great majority of the testimony was offered on behalf of the shippers, and was said by the Commission in its report (Emergency Freight Charges, 1935, 208 I. C. C. 4, page 23) to be strikingly similar to that presented in the Fifteen Per Cent. Case, 1931, 178 I. C. C. 539; Id., 179 I. C. C. 215; Id., 191 I. C. C. 361 (sometimes referred to as Ex parte No. 103). While some shippers supported the petition of the railroads and some were neutral, the great majority were opposed to the increase. A considerable

amount of testimony related particularly to the production, marketing, and consumption of bituminous and anthracite coal. In its report the Commission reviewed, in relation to the proposed increases, the general agricultural situation and commercial and economic conditions affecting forest products, coal and coke, petroleum, iron ores, and other commodities.

With regard to the legal questions presented, the Commission in its report, Emergency Freight Charges, 1935, 208 I. C. C. 4, on page 24, said:

"The applicants stress their conception of this proceeding as a 'revenue case as distinguished from a rate case,' meaning thereby, as they further state, that—the 'railroads, in this case, depend upon their revenue necessities as establishing in large part the reasonableness of the rates as proposed, rather than upon features to which appeal is ordinarily made when it is asserted that a particular rate should be increased because it is out of line with other rates and, therefore, not bearing its reasonable proportion of the burden.'

"The applicants concede that 'the duty devolves upon them to show affirmatively that the rates proposed are reasonable in and of themselves.' They urge, however, that they should not be expected to deal separately with each rate involved in order to prove its reasonableness, since so long a time would be required as to defeat the end of the proceeding. To establish the reasonableness of the rates which would result from their proposals the applicants rely almost wholly on the fact that the $170,000,000 of added revenue, which their estimate leads them to expect, would still fall short of earning a fair return on what they consider half the value of their property. They base this argument largely on Dayton-Goose Creek Ry. Co. v. United States, 263 U. S. 456, in which the Supreme Court (page 480) [44 S. Ct. 169, 172, 68 L. Ed. 388, 33 A. L. R. 472] said:

" 'Rates which as a body enable all the railroads necessary to do the business of a rate territory or section, to enjoy not more than a fair net operating income on the aggregate value of their properties therein economically and efficiently operated, are reasonable from the standpoint of the individual shipper in that Section.'

"Applicants' argument is substantially the same as that which they advanced in Ex parte No. 103. In referring to that argument at pages 560–564 of the original report in that case [178 I. C. C. 539], we said:

" 'But section 15a has not, in our opinion, made revenue needs the "paramount and controlling" factor in the determination of a reasonable general level of rates. Factors which theretofore were relevant and entitled to consideration, notwithstanding the revenue needs of individual carriers, are still relevant and entitled to consideration, notwithstanding the revenue needs of the carriers in the aggregate or by groups.' "

Section 15a of the Interstate Commerce Act was amended by the Emergency Railroad Transportation Act 1933 (49 USCA § 15a), and the Commission noted that the instant proceeding was the first general revenue case presented to it since the amendment, and that some of the shippers contended that the effect of the amendment was to shift the emphasis in rate making from the need of the carriers for revenue to the need of the shippers for free movement of traffic. As to this the Commission observed: "There is nothing in the terms of either the old or new section to indicate that primary weight should be given to any particular clause, and the Supreme Court in referring to the new section has stated that 'the substituted rule of rate making by its express terms emphasizes the carriers' need of adequate revenues,' and further has pointed out that the amendment embodying the new act was part of the Emergency Railroad Transportation Act, 1933, which was designed to aid national control for essential National purposes over the railway systems of the country 'in the light of the depressed economic condition of the railways.' Florida v. United States, 292 U. S. 1, 7 [54 S. Ct. 603, 78 L. Ed. 1077]. In General Rate Level Investigation, 1933, supra [195 I. C. C. 5], we expressed the conclusion that the weight to be given to the respective factors specified in section 15a depends upon the facts presented, and we adhere to that view."

The conclusion of the Commission upon the evidence was that the particular selective basis for increase of rates applied for should be rejected, largely because in the opinion of the Commission it would not be really beneficial to the railroads for various reasons, principally competitive in nature; and as applied to certain kinds of traffic the rates would be increased

above a just and reasonable level particularly as to products of agriculture and forestry, and live stock. Nevertheless, on the evidence, the Commission concluded that moderate increases in rates on a selective basis suggested by the Commission would be justified and possibly effective. And the Commission said:

"We are of opinion, therefore, that the emergency confronting the railroads is of such gravity that they should be permitted to add a system of emergency charges to most of the existing freight rates and charges for application during the remainder of 1935 and the first half of 1936. The system which we approve is similar in a general way to the one formerly in effect with some differences in amounts and other features which seem desirable in the light of the present record. * * *

"The emergency charges authorized are set forth in detail in appendix A. * * *

"It should be clearly understood that the plan of emergency charges here provided is permissive in character. * * *

"We find that the carriers' application, as a whole, should be denied, and our plan of emergency charges is offered in substitution of applicants' proposal. Except as we have had occasion to point out specifically certain of those proposals as not justified on the present record, we are not passing upon the lawfulness of the individual proposals, which cover many thousands of rates and necessarily cannot be dealt with in a report of this compass, particularly the numerous exceptions affecting Mountain-Pacific territory. * * *

"As in Ex parte No. 103, we shall grant the necessary authority under section 6 for filing blanket supplements embodying the emergency charges here provided for, and such supplements will be permitted to take effect without suspension, subject to the proviso that the resulting rates will in all respects be subject to complaint or to investigation and to determination as to the lawfulness of schedules or rates, as provided by the act. In applicants' closing brief they concede in effect that the decision in Arizona Grocery Co. v. Atchison, T. & S. F. Ry. Co., 284 U. S. 370 [52 S. Ct. 183, 76 L. Ed. 348], will have no application to increases in rates such as those which we authorize. * * *

"Subject to the qualifications indicated, we find that the present rates and charges, as increased by the emergency charges here authorized will not be in excess of just and reasonable rates for a period to terminate June 30, 1936."

The Commission also granted the railroad's petition for relief from the provisions of section 4 of the Interstate Commerce Act (49 USCA § 4) regarding rates for long and short hauls; and as to this the Commission said: "At the oral argument they [the railroads] suggested that a fourth-section order similar to the one issued in connection with Ex parte No. 103 would be appropriate. As the scope of the proceeding clearly includes the question of fourth-section relief, and as the situation clearly presents a special case under the statute we shall enter an order authorizing departures from section 4 in order to permit the emergency charges here approved to be established. An order will also be entered, amending outstanding orders for the same purpose."

In separate opinions four members of the Commission, a minority, dissented from the conclusions reached.

It was estimated that the increased rates permitted would yield the railroads approximately $85,000,000 additional revenue. With respect to coal, the maximum increase permitted was 15 cents, where the previous rate was over $1.50.

It will be noted that the only order passed by the Commission was one designated "fourth-section order No. 11,900" which permitted the roads to establish the emergency charges approved without observing the provisions of section 4 of the Interstate Commerce Act; and an order modifying to the extent necessary to permit the emergency charges, "all outstanding unexpired orders of the Commission, whether or not effective upon the date of this order, authorizing or prescribing rates and charges which have or have not been published at the date of this order, and all outstanding suspension orders." These orders were dated March 26, 1935; and the railroads promptly filed so-called "master" tariffs which, in connection with other particular tariffs on file, had the effect of increasing the rates as permitted by the report of the Commission, the increases to take effect on April 18, 1936. The object of this proceeding is to enjoin putting these increased rates into effect, so far as they apply to the plaintiffs.

The United States and the Interstate Commerce Commission have moved to dismiss the petition on the ground that the

plaintiffs do not have a proper legal status to maintain it. This motion presents one of the questions in the case. The other question is whether the orders of the Commission are invalid.

The plaintiffs' contention, as to the alleged invalidity of the order, is in substance that the conclusion of the Commission that the increased rates "will not be in excess of just and reasonable rates for a period to terminate June 30, 1936" is not itself a finding of fact (but merely a conclusion) and is based only on the finding of fact as to the financial needs of the carriers which is not legally sufficient to justify the conclusion, and therefore the action of the Commission in entering the orders was arbitrary and without warrant in law. In support of the sufficiency of their status to maintain the suit, the plaintiffs show that they were participants in the hearing before the Commission and are very directly interested in the subject-matter of the amount of transportation charges on coal mined by them. In addition, as affecting the merits of their case, they point to the fact alleged in the bill, supported to some extent at least by affidavits, that they will be very prejudicially affected by the increased rates on coal by reason of the economic conditions presently applicable to the bituminous coal industry. It is said that there is no sufficient present margin between cost of production and selling price to allow them to absorb the extra 15 cents per ton for carriage; and by reason of their sharp competition with other products producing heat and energy, such as oil, gas, and hydroelectric power, they will, by the necessary increase in selling price, owing to the added transportation charge, suffer irreparable loss of business from such competition. They also point out as bearing on the general merits of the case that the railroads named by them as defendants in this case, on which the carriage of their coal originates for interstate transportation, are relatively in much less need of financial relief than most of the other railroads of the country; and that a very large percentage of the freight traffic of these particular railroads consists of the carriage of coal, which is generally profitable to them.

On the other hand, in defense of the Commission's orders, it is pointed out that the Commission was dealing with an emergency situation affecting the railroads, national in its scope and effect on the trans-portation systems of the country; that the report of the Commission shows ample findings of fact to justify the relief granted; that the procedure adopted by the Commission is in accordance with the approved modern practice where the national rate structure is necessarily involved, and is in all material aspects substantially the same as that adopted by the Commission in the Fifteen Per Cent Case, 1931, which, it is said, was approved by the Supreme Court in United States v. Louisiana, 290 U. S. 70, 54 S. Ct. 28, 78 L. Ed. 181. And it is stressed, to the contrary of one of the contentions of the plaintiffs, that the Commission was not dealing with particular rates on particular traffic but with a general rate structure applicable to all traffic of selected classes indicated by the Commission. As to the status of the plaintiffs to maintain this suit, it is particularly stressed that the Commission has not determined particular rates for particular traffic; that the remedy of the plaintiffs as to the alleged unjust and unreasonable character of the increases of rates as affecting their particular situation is to apply to the Commission for redress under sections 13, 15, and 16 of the Interstate Commerce Act (49 USCA §§ 13, 15, 16) and that nothing the Commission has ordered or decided precludes them from obtaining appropriate relief by that procedure or from obtaining orders for "reparation" therein. And it is urged that injunctive relief granted by the court in this case would inject confusion and create discrimination as between the plaintiffs and coal operators in other territories and generally disrupt the rate structure permitted by the Commission to the railroads generally with respect to the carriage of coal, as is pointed out in an affidavit filed on behalf of the carriers.

■ A correct determination of these issues will follow from the proper understanding of the nature and effect of the proceedings before the Commission, in relation to the statutory scheme of rate regulation erected by the Interstate Commerce Act (49 USCA § 1 et seq.). In the first place, it is to be noted that the only orders passed by the Commission were for fourth-section relief and modification or suspension of existing rate orders of the Commission; and that these two orders are of themselves purely incidental to the main purpose of the proceeding before the Commission. Furthermore, it is to be noted that it is not clearly shown by the plaintiffs that they suffer any

injury by virtue of these particular orders, which were merely a means to an end. (Note 1.) The end itself, and the chief result of the proceeding before the Commission, was merely to give permission to the carriers to file "master" tariffs carrying the increased rates, which the Commission determined, in the exercise of its discretionary power, it would not suspend. It is true that the roads asked for relief in a more positive and definite form, but this was denied by the Commission. The report of the Commission distinctly states that the plan of emergency charges is permissive in character and that the resulting rates initiated by the carriers "will in all respects be subject to complaint and investigation to determine the reasonableness of the schedules and rates as provided by the Act"; and that what the Commission decided will not debar the plaintiffs from reparation orders in proper cases. Arizona Grocery Co. v. Atchison, T. & S. F. Ry. Co., 284 U. S. 370, 52 S. Ct. 183, 76 L. Ed. 348.

The result of the Commission proceedings, therefore, was merely to permit the railroads to initiate new rates. (Note 2.) It is important to remember that the Interstate Commerce Act does not deprive the carriers of this initiative which was theirs at common law. Arizona Grocery Co. v. Atchison, T. & S. F. Ry. Co., 284 U. S. 370, 384, 52 S. Ct. 183, 76 L. Ed. 348; United States v. Chicago, M., St. P. & P. R. Co., 294 U. S. 499, 55 S. Ct. 462, 79 L. Ed. 1023, March 4, 1935. True it is that their freedom of action is in many practical aspects greatly limited by the expansion of powers given to the Commission by recent amendments. But fundamentally the initiative as to proposing rates still remains with the carriers. This initiative can be checked by the Commission by suspending new tariff rates for a limited time pending a hearing; and can be defeated by or-

der of the Commission to the effect that the proposed new rates will be unjust and unreasonable; and the Commission can, and of course in many cases does, fix and determine what will be just and reasonable rates. In this case the Commission determined not to suspend the increased rates proposed for the limited period, and determined that no further hearing was necessary in view of the extended hearing already given. It is true that ordinarily rate changes are initiated by the carrier by the filing of new tariffs with the Commission before a hearing. But this order of procedure is not definitely required by the act, and there would seem to be no reasonable objection to the procedure actually adopted here in view of the quite imperative emergency situation confronting the railroads. Indeed we read United States v. Louisiana, 290 U. S. 70, 54 S. Ct. 28, 78 L. Ed. 181, as approving a substantially similar procedure adopted by the Commission in the Fifteen Per Cent Case, 1931. In view of the emergency situation caused by rapidly changing economic conditions, affecting the railroads of the country generally, the act would be most unfortunately inflexible if the procedure for relief in this case had required months of delay entailed by new hearings, in addition to the extended hearings already given in the case prior to the filing of the Commission's report.

The position taken by the plaintiffs seems to misconceive the real nature and effect of the Commission proceeding. They take the view that what the Commission did in effect was to determine what would be just and reasonable rates for particular traffic transported by particular railroads, on insufficient findings of fact. If this were really the situation confronting the court, it is clear enough as a result of recent Supreme Court decisions that the order of the Commission should be set aside, if the plaintiffs have a standing to invoke

that relief. United States v. Chicago, M., St. P., & P. R. Co., 294 U. S. 499, 55 S. Ct. 462, 79 L. Ed. 1023·; United States v. Baltimore & O. R. Co., 293 U. S. 454, 55 S. Ct. 268, 79 L. Ed. 587 (power reverse gear case); Florida v. United States, 282 U. S. 194, 215, 51 S. Ct. 119, 75 L. Ed. 291. As already pointed out, in our opinion this misconceives what the Commission did. It *prescribed* no particular rates. It merely permitted the carriers to file new rates without suspension. It will, therefore, be open to the plaintiffs to present their contentions as to the particular rates affecting them in proper proceedings before the Commission under section 13 (49 USCA § 13). That is to say, the increased rates now complained of are *carrier made* rates and not *Commission* made rates. (Note 3.)

■ Nor do we think that the conclusion of the Commission, that the permitted rates for the limited period would not be in excess of just and reasonable rates, is lacking in support from the findings of the Commission. What was permitted was a general increase on selected commodities nationally uniform in amount and character (with some possible exceptions not here important). In the particular case clearly the dominant consideration was the railroads' need of additional revenue. This fact was conceded by all, or at least not disputed. But the Commission was at pains to indicate that the need of the carriers was not the only important factor in rate making either for particular rates or for general rates; nor did the Commission fail to consider general economic conditions affecting various classes of commodities carried in interstate commerce, including particularly bituminous coal. The conclusion reached was that on a comprehensive survey of the facts presented in 8,000 pages of testimony, involving necessarily a consideration of the economic situation of shippers as well as carriers, the one outstanding indisputable fact was the need of the carriers for more revenue to meet increased operating expenses. As the evidence taken before the Commission is not before us, we are, of course, limited to the report of the Commission for its findings of fact and conclusions of law. Mississippi Valley

Barge Line Co. v. United States, 292 U. S. 282, 54 S. Ct. 692, 78 L. Ed. 1260; Cape Fear Rys., Inc., v. United States et al., 294 U. S. 693, 55 S. Ct. 403, 79 L. Ed. ——. In our opinion the conclusion of the Commission in this case was not based on inadequate, uncertain, or ambiguous findings and the financial needs of the carriers as found in this case furnish ample legal basis for the Commission's conclusion. Dayton-Goose Creek Ry. Co. v. United States, 263 U. S. 456, 44 S. Ct. 169, 68 L. Ed. 388, 33 A. L. R. 472; United States v. Louisiana, 290 U. S. 70, 54 S. Ct. 28, 78 L. Ed. 181; Florida v. United States, 292 U. S. 1, 54 S. Ct. 603, 78 L. Ed. 1077. The first two of these cases dealt with section 15a prior to the amendment by the Act of June 16, 1933, which repealed the recapture provisions of that original section and somewhat rephrased the principle of rate making to read as follows: "In the exercise of its power to prescribe just and reasonable rates the Commission shall give due consideration, among other factors, to the effect of rates on the movement of traffic; to the need, in the public interest, of adequate and efficient railway transportation service at the lowest cost consistent with the furnishing of such service; and to the need of revenues sufficient to enable the carriers, under honest, economical, and efficient management, to provide such service."

The effect of the amendment, with regard to the principles of rate making, was considered in Florida v. United States, 292 U. S. 1, 6, 7, 54 S. Ct. 603, 606, 78 L. Ed. 1077, where it was said: "On the contrary, the substituted rule of rate making by its express terms emphasizes the carriers' need of adequate revenues. * * * The new act discloses no intention to weaken national control for essential national purposes over the railway system of the country. It was·rather designed to aid that control in the light of the depressed economic condition of the railways."

It is evident from the Commission's report as a whole that very thorough consideration was given to the important problem presented. Its conclusion on the facts is entitled to great weight. Illinois Cent. R.

Co. v. Interstate Commerce Commission, 206 U. S. 441, 27 S. Ct. 700, 51 L. Ed. 1128. The plaintiffs are indeed entitled to reasonable rates and it may be conceded that the mere needs of the carriers, entirely apart from the reasons for the need, do not alone determine what are reasonable rates. Public Service Commission of Montana v. Great Northern Utilities Co., 289 U. S. 130, 53 S. Ct. 546, 77 L. Ed. 1080. But here it appears that the particular need arises, not directly from lack of efficient management or the effects of competition alone, but is caused by greatly increased operating expenses due to rapidly changing general economic conditions. We think it cannot be said that a marked increase in operating expenses due to this latter cause is an insufficient basis for the conclusion that previously existing rates had become unreasonably low, in view of the statutory principle of rate making as announced in the amended section 15a.

■■ The Commission was not without authority, in the exercise of its administrative discretion, in passing the order for fourth-section relief, as it found that a special case existed which justified its action in that respect. United States v. Merchants' & Manufacturers' Traffic Ass'n of Sacramento, 242 U. S. 178, 37 S. Ct. 24, 61 L. Ed. 233. In this respect the case differs from the special situation disclosed in Skinner & Eddy Corporation v. United States, 249 U. S. 557, 39 S. Ct. 375, 63 L. Ed. 772. And likewise the Commission had the power to pass the order modifying its prior outstanding and effective orders as to particular rates. This power is given by sections 15 (2) and 16 (6) of the Interstate Commerce Act, 49 USCA §§ 15 (2), 16 (6).

■ As has been pointed out, it is not shown that these two orders prejudicially affect the plaintiffs. What does affect them is the failure of the Commission to suspend the new rates. But this again was clearly within the administrative discretion of the Commission under section 15 (7) of the act (49 USCA § 15 (7). Speaking of this, in Board of Railroad Commissioners v. Great Northern Ry. Co., 281 U. S. 412, 429, 50 S. Ct. 391, 396, 74 L. Ed. 936, the Chief Justice, for the Supreme Court, said: "Congress, in 1910, authorized the Interstate Commerce Commission, on the filing of rates by interstate carriers with the Commission, to suspend the operation of the rates for a stated period, and this provision has been continued in later legislation. Interstate Commerce Act, § 15 (7); 36 Stat. 552; 41 Stat. 486, 487 (49 USCA § 15 (7). This power of suspension was intrusted to the Commission only."

From this it appears clearly enough that if the Commission in its discretion does not suspend the new rates, the courts have no power to do so. See, also, M. C. Kiser Co. v. Central of Georgia Ry. Co. (D. C.) 236 F. 573, affirmed on appeal (C. C. A. 5) 239 F. 718.

■ In addition to these considerations, which of themselves would require dismissal of the bill, we also think it must be dismissed for the further reason that the plaintiffs did not have a sufficient status to maintain it. They have no independent definite legal right which is prejudicially affected by the orders of the Commission. It is not overlooked that they were protestants before the Commission against increased rates and that they are directly interested in that their competitive position with other products used for fuel and energy may be prejudicially affected, but this condition will be uniformly applicable to all coal producers and will not bear peculiarly on the plaintiffs. The two affirmative orders passed by the Commission are not shown of themselves to directly prejudice the plaintiffs. What does affect them is the failure of the Commission to suspend the new rates but, as has been pointed out, this was a matter within the administrative discretion of the Commission, not now reviewable in the courts. The plaintiffs are, of course, entitled to reasonable and nondiscriminatory rates. It cannot be said that the orders passed by the Commission and the determination of the Commission not to suspend the new rates, discriminate against the plaintiffs. On the contrary, much appears in the case to the effect that setting aside the orders of the Commission in this case at the instance of the plaintiffs would tend to discriminate in their favor against others similarly situated; or would in large measure tend to disrupt the national rate structure as to coal and possibly defeat the relief afforded to the roads by the Commission's permission to put into effect without suspension the new rates, so far as the carriage of coal is concerned.

The plaintiffs have mistaken their remedy in the statutory scheme of railroad rate making. Their contention is that the Commission, without sufficient evidence or prop-

er findings of fact, has determined or fixed particular rates for the plaintiffs' particular traffic. But this misconceives what the Commission has actually done. It was not dealing finally with particular rates for particular traffic, but permitting increased rates for selected commodities, by a general order affecting all the railroads in the country. If the increased rates as applied to the plaintiffs' particular situation can be shown to be unjust and unreasonable, their remedy is clearly by proceedings under sections 13 and 15 of the act (49 USCA §§ 13, 15) for individual relief, and for reparation orders under section 16 (1) of the act, 49 USCA § 16 (1). Brimstone R. & Canal Co. v. United States, 276 U. S. 104, 122, 48 S. Ct. 282, 72 L. Ed. 487; Alexander Sprunt & Son v. United States, 281 U. S. 249, 256, 50 S. Ct. 315, 74 L. Ed. 832; Eagle Cotton Oil Co. v. Southern Ry. Co. (C. C. A. 5) 51 F.(2d) 443, certiorari denied 284 U. S. 675, 52 S. Ct. 130, 76 L. Ed. 571. Nothing in the Commission case debars them from such relief. Counsel for the railroad companies before the Commission and in this court proceeding concede that the rule of Arizona Grocery Co. v. Atchison, T. & S. F. Ry. Co., 284 U. S. 370, 52 S. Ct. 183, 76 L. Ed. 348, would not be available to defeat the plaintiffs' remedy in this respect before the Commission, upon a proper showing.

It is necessarily inconsistent with the whole scheme of the Interstate Commerce Act, which requires uniformity and nondiscrimination as to rates, to permit particular shippers to obtain individual relief in courts of different jurisdictions, with possible lack of uniformity in results, in matters committed to the administrative functions of the Commission, including the reasonableness of rates, until after the Commission has acted on the particular subject. Texas & Pac. Ry. Co. v. Abilene Cotton Oil Co., 204 U. S. 426, 27 S. Ct. 350, 51 L. Ed. 553, 9 Ann. Cas. 1075; Baltimore & O. R. Co. v. United States ex rel. Pitcairn Coal Co., 215 U. S. 481, 30 S. Ct. 164, 54 L. Ed. 292; Great Northern Ry. Co. v. Merchants' Elevator Co., 259 U. S. 285, 291, 42 S. Ct. 477, 66 L. Ed. 943. Consistently therewith, it has been held by the Supreme Court in a number of cases, that individual shippers may not maintain suits to annul orders of the Commission unless they can show an invasion thereby of some independent legal right, whereby they particularly are subjected to injury. Alexander Sprunt & Son v. United States, 281 U. S. 249, 256, 50 S. Ct. 315, 74 L. Ed. 832; United States v. Merchants' & Manufacturers' Traffic Ass'n of Sacramento, 242 U. S. 178, 37 S. Ct. 24, 61 L. Ed. 233; Edward Hines Yellow Pine Trustees v. United States, 263 U. S. 143, 44 S. Ct. 72, 68 L. Ed. 216.

The cases relied on by the plaintiffs in support of their right to maintain the suit, particularly Interstate Commerce Commission v. Diffenbaugh, 222 U. S. 42, 32 S. Ct. 22, 56 L. Ed. 83; Skinner & Eddy Corporation v. United States, 249 U. S. 557, 39 S. Ct. 375, 63 L. Ed. 772, and Chicago Junction Case, 264 U. S. 258, 44 S. Ct. 317, 68 L. Ed. 667, are distinguishable in that in those cases the plaintiffs did have an independent legal right which was invaded by the order. The distinction was clearly pointed out in footnote 5 on page 257 of 281 U. S., on page 318 of 50 S. Ct., 74 L. Ed. 832, in the Alexander Sprunt & Son Case. Counsel have called to our attention the case of Youngstown Sheet & Tube Co. v. United States, 55 S. Ct. 822, 79 L. Ed. 1553, decided by the Supreme Court May 20, 1935, in which it was held that the plaintiff shippers had a proper standing to maintain a suit to annul an order of the Commission which fixed maximum rates on coal from Ohio River points to destinations in northern Ohio. But we think the case is distinguishable because the Commission had there fixed particular rates which directly affected the particular shipper. The case did not deal with a general rate order, but with one that was conclusive with regard to a particular rate.

It is not contended by the defendants here that the court is without jurisdiction in this case; nor that no shipper under any circumstances has standing to maintain a suit to enjoin Commission orders; but that they may do so only when they are able to show that the order is for some reason invalid and subjects them to particular legal injury. In this case we fail to find that the Commission's order has deprived the plaintiffs of any independent legal right.

For these reasons, the bill must be dismissed.