The **CHESAPEAKE AND OHIO RAIL-WAY COMPANY et al.,**
Plaintiffs,

v.

**UNITED STATES of America and Interstate Commerce Commission,**
Defendants.

**Civ. A. No. 74–0370–R.**

United States District Court,
E. D. Virginia,
Richmond Division.

Argued Dec. 20, 1974.

Decided April 22, 1975.

Owen Clarke, Ilene Chase Gregg, Doyle S. Morris, Charles C. Rettberg, Jr., Cleveland, Ohio, George D. Gibson, E. Milton Farley, III, T. S. Ellis, III, Richard D. Gary, Hunton, Williams, Gay & Gibson, Richmond, Va., for plaintiffs.

Thomas E. Kauper, Asst. Atty. Gen., John H. D. Wigger, Atty. Dept. of Justice, David Hopkins, U. S. Atty., E. D. Va., David G. Lowe, Asst. U. S. Atty., for the United States.

Fritz R. Kahn, Gen. Counsel, Hanford O'Hara, Atty., I. C. C., for the I. C. C.

Before BUTZNER, Circuit Judge, and MERHIGE and WARRINER, District Judges.

BUTZNER, Circuit Judge:

In this petition for review of a series of orders of the Interstate Commerce Commission in Ex Parte No. 305, Nationwide Increase of Ten Percent in Freight Rates and Charges, 1974, the Chessie system lines challenge the power of the Commission to condition the refiling of a rate increase, without investigation or suspension, on the expenditure of revenue derived from the increase in the manner directed by the Commission.[1] We conclude that the Commission lacks statutory authority to order a railroad how to spend its revenue, and we hold that this condition should not be enforced against the Chessie system. Chessie also charges that the Commission unlawfully required it to file certain reports. We hold that the orders to furnish the requested information are incidental to the Commission's authority to suspend the proposed rate increases and are therefore not reviewable.

1. The Chessie system lines consist of the Chesapeake and Ohio Railway Company, the Baltimore and Ohio Railroad Company, and the Western Maryland Railway. For the sake of brevity we shall refer to them as Chessie.

## I

In April 1974 Chessie and all other railroads, except the Long Island, petitioned the I. C. C. for a 10 percent increase in freight rates. Among the reasons cited for the increase was the statement that "billions of dollars are needed immediately and in the coming decade for maintenance and improvement of the Nation's rail transportation plant." A number of shippers protested, so the Commission did not allow the carriers to initiate the proposed tariffs on short notice. The railroads again filed for an increase in May. On June 3 the Commission acknowledged the railroads' need for an increase but ruled that "if the schedules were permitted to become effective as filed and without conditions designed to promote service improvements, the increases proposed would be unjust and unreasonable and contrary to the dictates of the national transportation policy." Accordingly, it suspended the proposed tariff and at the same time authorized the railroads to refile, incorporating conditions which would assure

that the additional revenue would be expended for capital improvements and deferred maintenance of plant and equipment.[2]

The railroads, including Chessie, then cancelled the prior increase and on June 5, 1974, refiled in accordance with the conditions of the June 3 order. However, on July 18, the Commission clarified its June 3 order. It allowed up to 3 percent of the revenue derived from the rate increase to be applied to higher material and supply costs, other than fuel. It required the railroads to expend the balance of the new revenue, less the income taxes attributable to it, for deferred maintenance and delayed capital improvement. For the purposes of the order, the Commission narrowly defined the term "deferred maintenance" as accrued deterioration producing a severe adverse effect on railroad operations. It also prohibited expenditure of the funds for any capital improvements that had been scheduled or otherwise committed as of June 1, 1974.[3]

2. The conditions imposed by the June 3 order are:

"1. On or before August 19, 1974, each carrier shall provide this Commission (a) with an estimate of the costs of deferred plant and equipment maintenance as of June 30, 1974; number and percent of bad order cars by type; and miles of track by class on which slow orders were in effect. The estimate of deferred maintenance should be classified to show amounts for equipment by type of cars, locomotives plant, including yard and running track, and other similar classes of property and facilities; (b) with a report of the annual maintenance and capital expenditures for the years 1971–1973, inclusive, and the 1st and 2nd quarters of 1974. A report of estimated maintenance and capital investments shall be provided for the 3rd and 4th quarters of 1974 and the first two quarters of 1975.

"2. All railroads shall maintain a monthly record of the increased freight revenues derived from the increases by months. The increased freight revenues may be estimated if the procedure for the estimations is explained.

"3. Revenues generated by the increases should be expended for capital improvements and deferred maintenance of plant

and equipment and the amount needed for increased material and supply cost, other than fuel. A record of such expenditures shall be maintained on a monthly basis.

"4. At the end of the 3rd, 6th, and 9th months following the effective date of the increases, each carrier shall provide this Commission with an estimate of the freight revenues generated by the increases. Additionally, each carrier shall report the amount of expenditures made for deferred maintenance of plant and equipment, e. g., by type of car, track, cross ties, etc., as well as amounts expended for capital improvements by type of project. Furthermore, each carrier shall report the amount of unexpended funds derived from the authorized increases and how those funds are to be expended."

3. The July 18 order defined "deferred maintenance" and "delayed capital improvements" as follows:

"For purposes of this order, deferred maintenance is defined as the accrued deterioration or deficiency in the physical operating condition of railroad track structures, cars and locomotives, and other property used in the provision of transportation service resulting from the failure and/or inability to properly maintain

Protesting that it had neither deferred maintenance nor delayed capital improvements as defined by the Commission, Chessie petitioned for an amendment to the July 18 order that would allow it to expend the additional funds for any valid corporate purpose. On August 9 the Commission denied Chessie's petition but relaxed its order by changing the cut-off date for determining what constituted delayed capital improvements.

Rebuffed by the Commission, Chessie instituted this action on August 15, 1974, and in due course secured an interlocutory injunction restraining the Commission from controlling Chessie's expenditure of its increased revenues.[4] In the meantime, at the instance of other railroads, the Commission reopened the proceedings. After a hearing, in which Chessie declined to participate, the Commission on October 3 modified its orders of June 3, July 18, and August 9 by allowing a railroad to use the increased revenues for new capital improvements if it could show that it could not use the funds for deferred maintenance and delayed capital improvements, as defined by the Commission.[5] Chessie then amended its complaint, alleging

that the restrictions on expenditure of revenue, even as modified by the October 3 order, exceeded the Commission's statutory authority.

## II

At the outset the Commission challenges the jurisdiction of the Court to review the questioned orders. It contends that administrative proceedings involving the suspension of rates are free from judicial review. Consideration of this defense requires examination of the suspension process.

Railroads have always had the right to initiate higher rates, and the Interstate Commerce Act of 1887 did not grant the Commission power to suspend the new charges. Shippers therefore sought injunctive relief while the Commission investigated the lawfulness of the increases. However, the expense of litigation and the courts' lack of uniformity prompted Congress in 1910 to authorize the Commission to suspend a new rate for no more than seven months while it conducted an investigation. The principal cases interpreting the 1910 amendment, codified as 49 U.S.C. § 15(7),[6] are United States v. SCRAP, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254

plant and equipment, which produces an adverse effect on railroad operations to an extent that services to shippers have been rendered partially or wholly inadequate and/or has resulted in diminishing the railroads' competitive ability;

"For purposes of this order, delayed capital improvements represent actually planned, specifically identified capital improvements necessary for the provision of adequate or improved transportation service to shippers and which had not been undertaken, scheduled, or otherwise committed because funding or financing was not, or projected to be, available through June 30, 1975. They exclude improvements in progress and those scheduled or otherwise committed and recognized in capital budgets in effect or applicable on June 1, 1974. These capital improvements are further identified as delayed expenditures which would (1) add to or improve the carriers' plant and/or equipment so as to increase its usefulness, capacity, durability and efficiency, and (2) which are capitalizable in the property accounts in

accordance with the Commission's accounting regulations; . . . ."

4. No other railroad filed suit against the Commission.

5. The October 3 relaxation of previous orders was stated as follows:

"*It is further ordered,* That railroad respondents, if any, which are unable to use the full amount of the funds generated by the increase for deferred maintenance or delayed capital improvements, as defined in this proceeding, may expend such funds for new and additional capital improvements providing advance approval is obtained from the Commission, Division 2, as above set forth: . . . ."

6. 49 U.S.C. § 15(7) provides in part:

"Whenever there shall be filed with the Commission any schedule stating a new . . . rate, . . . the Commission shall have . . . authority, either upon complaint or upon its own initiative without complaint, at once, and if it so orders without answer or other formal pleading

(1973), and Arrow Transportation Co. v. Southern Railway Co., 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963). In *Arrow* the Court concluded that Congress intended "to vest in the Commission the sole and exclusive power to suspend and to withdraw from the judiciary any pre-existing power to grant injunctive relief." 372 U.S. at 667, 83 S.Ct. at 988. It therefore held that a district court could not restrain a railroad from charging the proposed rates after the seven-month administrative suspension period, even though the Commission had not completed its investigation. In *SCRAP* the Court held that the exclusive suspension power vested in the Commission by § 15(7) deprived a district court of jurisdiction to forbid the collection of a new rate which the Commission had not suspended.

■ *Arrow* and *SCRAP* establish beyond question our lack of jurisdiction to review the provisions of the June 3 order that suspended the proposed rates. Nor can we enjoin the Commission from permitting the railroads to refile and collect the increased rates. The Commission's discretion in these matters is unbridled, and its decision regarding suspension is unreviewable. *See generally* K. Davis, Administrative Law Treatise 966 (1970 Supp.).

■■ However, lack of power to review certain parts of the Commission's orders does not deny jurisdiction to examine other parts. Congress gave the courts jurisdiction to review "in whole or in part" any order of the Commission. 28 U.S.C. § 1336(a). A condition is considered a separate part of an order for the purpose of exercising this jurisdiction. United States v. Chicago, M. St. P. & P. R. R. Co., 282 U.S. 311, 328, 51 S.Ct. 159, 75 L.Ed. 359 (1931). We turn, therefore, to the suspension power in § 15(7) to determine whether Congress intended to withdraw from the judiciary claims that the Commission has unlawfully conditioned the suspension of rates on compliance with a requirement which it would otherwise have no statutory authority to impose. Section 15(7) mentions only one condition as concomitant to the Commission's power to suspend. The Commission can require the carrier to keep account of the amounts received from an increased rate and to refund any portion that ultimately is found to be unjustified.[7] A suspension order imposing this statutory condition is not subject to judicial review. Port of New York Authority v. United States, 451 F.2d 783, 786 (2d Cir. 1971) (by implication).

■ The statute's silence about other conditions should not be interpreted as a denial of the Commission's authority to appropriately restrict the exercise of its suspension power in a variety of ways. But when the Commission has selected a condition that is not expressly authorized by § 15(7), the courts have jurisdiction to determine whether

by the interested carrier . . ., but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, . . . and pending such hearing and the decision thereon the Commission, upon filing with such schedule and delivering to the carrier . . . affected thereby a statement in writing of its reasons for such suspension, may from time to time suspend the operation of such schedule and defer the use of such rate, . . . but not for a longer period than seven months beyond the time when it would otherwise go into effect; and after full hearing, whether completed before or after the rate, . . . goes into effect, the Commission may make such order with reference thereto as would be proper in a proceeding initiated after it had become effective. . . . [T]he Commission may by order require the interested carrier . . . to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require the interested carrier . . . to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified."

7. See footnote 6, *supra*.

it should be set aside because it exceeds the Commission's regulatory powers. Judicial relief is available to curb administrative acts that exceed an agency's statutory authority. In Harmon v. Brucker, 355 U.S. 579, 581, 78 S.Ct. 433, 435, 2 L.Ed.2d 503 (1958), the Court rejected the defense that certain administrative action was unreviewable, saying:

> "Generally, judicial relief is available to one who has been injured by an act of a government official which is in excess of his express or implied powers. . . . The District Court had not only jurisdiction to determine its jurisdiction but also power to construe the statutes involved to determine whether the [official] did exceed his powers. If he did so, his actions would not constitute exercises of his administrative discretion, and, in such circumstances as those before us, judicial relief from this illegality would be available."

As Leedom v. Kyne, 358 U.S. 184, 188, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958), explains, in such instances a court does not simply review the agency's action in the same sense that it would review an order falling within the agency's statutory authority. Instead, the court must measure the order by the statute, and if it exceeds the agency's delegated power, the Court must annul it.

■ We conclude, therefore, that the general rule against judicial review of the Commission's exercise of its suspension power does not deprive the court of jurisdiction. It may hear and determine Chessie's claim that the provisions of the suspension orders that dictate the manner in which the additional revenues shall be used exceed the Commission's statutory powers.

■ But those provisions of the Commission's orders directing the railroads to supply information about the condition of their facilities, the amount of revenue generated by the rate increase, and the purposes for which it has been or will be expended stand on a different footing. Section 15(7) provides that the Commission "may from time to time suspend" the increased rates. Obviously, the Commission needs, and may demand, accurate, complete information from the carriers so that it can responsibly exercise its power to suspend. Therefore, because the reporting requirements are incidental to the Commission's exclusive power to suspend, they are not reviewable.

III

The Commission next asserts that Chessie is barred from seeking judicial relief because it failed to exhaust its administrative remedies. It bases this defense on the premise that Chessie should have participated in the reopened proceedings culminating in the October 3 order, that it should have applied for an exception as allowed by this order, or that it should have sought reconsideration of the order. Chessie responds that when it became apparent that the July 18 order would not permit it to utilize the rate increases allowed by the June 3 order, it promptly moved for exemption. It emphasizes that it filed this suit only after the Commission denied its petition. Chessie explains that it did not join the subsequent petition for reconsideration filed by other railroads and declined to participate in the Commission's rehearing because it feared placing its judicial standing in jeopardy.

■ We agree with the Commission that Chessie's institution of this action in August did not preclude the Commission from subsequently reopening the hearing at the request of other railroads. The statute authorizing the Commission to reopen its proceedings and to modify its orders does not prevent the Commission from acting, while a petition for review is pending, as long as its subsequent proceedings do not interfere with the suit. 49 U.S.C. § 17(6) and (7). American Farm Lines v. Black Ball Freight Service, 397 U.S. 532, 540–42, 90 S.Ct. 1288, 25 L.Ed.2d 547 (1970). Though the Commission conducted its rehearing and entered its Oc-

tober 3 order after this suit was filed, there was no interference. We heard the case after October 3 and consequently have been able to give full consideration to the Commission's post-suit proceedings. In multi-party administrative proceedings, some parties may seek reconsideration of the agency's final action, while others may seek judicial relief. Both tribunals may then exercise jurisdiction when, as here, they do not work at cross-purposes. Wrather-Alvarez Broadcasting, Inc. v. F. C. C., 101 U.S.App.D.C. 324, 248 F.2d 646, 648 (1957).

■ Contrary to the Commission's position, we conclude that Chessie has exhausted its administrative remedies. Because the Commission's October 3 order reaffirmed its authority over the carriers' expenditure of funds, Chessie could not have gained full relief, even if it were granted an exception on the Commission's terms. Moreover, Chessie did not have to reiterate its claim that the conditions were illegal by moving for reconsideration of the October 3 order. In Skinner & Eddy Corporation v. United States, 249 U.S. 557, 39 S.Ct. 375, 63 L.Ed. 772 (1919), a shipper sued to annul an order on the ground that the Commission had exceeded its statutory authority. In rejecting the contention that the shipper had not exhausted his administrative remedies, the Court said:

> "The contention is that the commission has exceeded its statutory powers; and that, hence, the order is void. In such a case the courts have jurisdiction of suits to enjoin the enforcement of an order, even if the plaintiff has not attempted to secure redress in a proceeding before the commission." 249 U.S. at 562, 39 S. Ct. at 377.

The Commission relies on Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638 (1938), which holds that a district court cannot enjoin a National Labor Relations Board hearing on the ground that the employer's business is not related to interstate commerce. Since Congress delegated the initial resolution of this factual issue exclusively to the Board, the Court ruled that the employer must exhaust his administrative remedies before challenging the Board's jurisdiction. Skinner and Myers were written by Mr. Justice Brandeis, and they are not contradictory. In Skinner the complaint attacked the statutory authority of the agency to act; in Myers it attacked the factual predicate to establish the agency's jurisdiction. Here, Chessie challenges the Commission's statutory authority to supervise the expenditure of its revenue. Consequently, Chessie is not barred from seeking judicial relief, even though it did not pursue administrative relief from the October 3 order.

## IV

■ As its third affirmative defense, the Commission alleges that Chessie is estopped from challenging the legality of the conditions in the June 3 order because it filed for the new rates allowed by this order and has benefited from them. The Commission points out that the joint petition for a rate increase filed by the nation's railroads emphasized the need for funds to maintain and improve tracks and equipment, and that the June 3 order was entered to enable the carriers to meet this exigency. Chessie asserts that it had anticipated its maintenance requirements by embarking on a $300 million capital improvement program in December 1973, six months before the Commission acted.

We have no doubt that Chessie's facilities require additional maintenance and improvement. For example, in 1973 it had 240 derailments because of defects and failures in its roadway as compared with 87 in 1964, an increase of 176 percent. Chessie's unrefuted need to maintain and improve its property was a factor causing it to join other railroads in seeking a rate increase, but proof of this does not establish that Chessie is estopped from questioning the legality of the Commission's conditions.

When Chessie refiled for the rate increase under the June 3 order, it was not clear that its current improvement program failed to comply with the Commission's order. Only after the Commission clarified its intent and defined its terms in the July 18 order did Chessie's officials become concerned that their program did not meet the Commission's specifications. Chessie did not acquiesce; instead, it immediately challenged the legality of the newly defined conditions. Thus, no action on its part lulled the Commission into withholding its power to suspend. At no time did Chessie represent to the Commission that it would use the new rate increase exclusively for deferred maintenance or delayed capital improvement as defined by the Commission. Nor did it pretend that it would submit to acts it believed to be in excess of the Commission's powers. It is the absence of this dissemblance and the Commission's lack of reliance on any statement or act of Chessie's that distinguishes this case from F. P. C. v. Colorado Interstate Gas Co., 348 U.S. 492, 75 S.Ct. 467, 99 L.Ed. 583 (1955), and Admiral-Merchants Motor Freight, Inc. v. United States, 321 F.Supp. 353 (D.Colo.1971), on which the Commission relies. Estoppel is an equitable doctrine, and it should not be lightly imposed to deprive a person of the right to challenge the legality of government action. We therefore hold that Chessie is not estopped from suing to enjoin the Commission.

## V

It is the Commission's position on the merits that since it could have unconditionally suspended the rate increase, it has the inherent authority to allow an increase subject to reasonable conditions consistent with the purposes of the Act. For its part, Chessie contends that Commission control over a railroad's revenues is not consistent with the Act.

 The starting point for the consideration of these contentions is the undeniable proposition that the Commission can impose conditions that have been expressly or impliedly authorized by law. See, e. g., United States v. SCRAP, 412 U.S. 669, 675, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); Port of New York Authority v. United States, 451 F.2d 783, 785–787 (2d Cir. 1971); Algoma Coal & Coke Co. v. United States, 11 F.Supp. 487, 493–94 (E.D.Va. 1935); cf. Southern Pacific Co. v. Olympian Dredging Co., 260 U.S. 205, 43 S.Ct. 26, 67 L.Ed. 213 (1922); D. C. Transit System, Inc. v. Washington Metropolitan Area Transit Commission, 151 U.S.App.D.C. 223, 466 F.2d 394 (1972). None of these cases suggest, however, that the Commission's authority to suspend rates enables it to exercise powers which Congress never expressly or impliedly conferred on it. Indeed, it is axiomatic that an administrative agency, a creature of the legislature, cannot exceed its statutory authority. Stark v. Wickard, 321 U.S. 288, 309, 64 S.Ct. 559, 88 L.Ed. 733 (1944). Closer to the point, an agency cannot condition the lawful exercise of its authority on compliance with an illegal proviso. Standard Airlines v. C. A. B., 85 U.S.App.D.C. 29, 177 F.2d 18, 20 (1949). We turn, therefore, to the critical question of the case: Has Congress expressly or impliedly authorized the Commission to direct railroads how they shall spend the revenue derived from a rate increase that is subject to the Commission's suspension power?

 The Act does not expressly authorize the Commission to condition withholding suspension of a rate increase on how the additional income is spent. As we previously noted, the provision of the Act granting suspension power, § 15(7),[8] explicitly empowers the Commission to condition the interim allowance of rates on refunds, should the new tariff subsequently be found unlawful. It is silent about other conditions. Therefore, lacking express authority, the Commission relies on implied authority.

---

8. See note 6 and text at note 7, *supra*.

Initially, the Act did not authorize the Commission to fix rates. Congress did not confer this power until it passed the Hepburn Act in 1906, which dealt only with maximum charges. The Transportation Act of 1920 granted authority to fix minimum as well as maximum rates.[9] It is a provision of the 1920 Act, now codified as 49 U.S.C. § 15a(2),[10] which the Commission cites as implied authority for its orders. Section 15a(2) prescribes certain factors which the Commission must take into consideration "[i]n the exercise of its power to prescribe just and reasonable rates." Never before has the Commission claimed that this section expands its rate-making power to embrace control over the expenditure of a carrier's revenue. Instead, its decisions have been to the contrary. Shortly after the passage of the Transportation Act of 1920, the Commission held in Missouri-Kansas-Texas R. R. Co. v. Kansas City Terminal Ry. Co., 104 I.C.C. 203 (1925), that § 15a did not authorize it to restrain a carrier from expending its revenue on an improvident contract. Construing § 15a, it said:

"What the provision requires or authorizes us to do is to fix remunerative reasonable rates in circumstances which embrace honest, efficient, and economical management as a condition or limitation. We should have the information in that respect which will aid an effective exercise of our duty and authority, but we are not commanded to insure or empowered to enforce such management, responsibility

for which at all times rests upon the carriers." 104 I.C.C. at 224.

The Commission's views about the limitation of its authority remained unchanged until the present controversy. As recently as 1971, the Commission ruled that the development of capital for improving deteriorated railroad facilities is a function of management, "not a measure of the reasonableness of rate levels." Increased Freight Rates 1970 and 1971, 339 I.C.C. 125, 180 (1971).

Since the Commission has not previously conditioned withholding the suspension of rates on control of a railroad's expenditures, no court has considered the precise issue presented by this case. However, in other contexts, courts have uniformly held that the Commission lacks statutory authority to order railroads how to spend their funds. In Missouri Pacific R. R. Co. v. Norwood, 42 F.2d 765 (W.D.Ark.1930), aff'd 283 U.S. 249, 51 S.Ct. 458, 75 L.Ed. 1010 (1931), the railroad claimed that it need not comply with a state full-crew law because Congress exclusively occupied this field by the Transportation Act of 1920. This Act, the railroad contended, authorized the Commission to prohibit the wasteful expenditure of a carrier's funds. Rejecting this claim, the district court said:

"The logical result of this contention, as to grant of power to the commission, is that Congress conferred the power to supervise carrier expenditures—at least, to the extent of preventing waste or improvidence. The

9. The Transportation Act of 1920, 41 Stat. 456, included a recapture clause which provided that one half of any income in excess of 6 percent of the value of the carrier's property was to be paid to the Commission for a general contingency fund. The railroads were required to keep a portion of the remainder in a reserve fund. Pub.L. 66–152 §§ 15a(6–8), 41 Stat. 456, 489 (1920). The clause was repealed in 1933, ending the only peacetime control over the railroads' expenditures. Pub.L. 73–68 § 206(a), 48 Stat. 195, 220 (1933).

10. 49 U.S.C. § 15a(2) provides:

"(2) In the exercise of its power to prescribe just and reasonable rates the Commission shall give due consideration, among other factors, to the effect of rates on the movement of traffic by the carrier or carriers for which the rates are prescribed; to the need, in the public interest, of adequate and efficient railway transportation service at the lowest cost consistent with the furnishing of such service; and to the need of revenues sufficient to enable the carriers, under honest, economical, and efficient management to provide such service."

power to do this *directly* would be a decided step in advance of any congressional action before the Transportation Act. This subdivision of this section deals with just one main subject. That subject is the rate of return on property value to be determined and allowed the carriers by the commission. As an element in such determination, the transportation needs of the country are to be considered by the commission. . . . Such provision gives no power of directly supervising carrier expenditures. It provides control *only* through the rate of return allowed by the commission. . . . There is no suggestion in the section as enacted, in the committee reports or in the congressional debates of any direct control by the commission of any expenditures of the carriers . . . " 42 F.2d at 773.

The Supreme Court has held that the Commission does not have the implied power to order railroads to construct a union station. Writing for the Court in I. C. C. v. United States ex rel. Los Angeles, 280 U.S. 52, 70, 50 S.Ct. 53, 57, 74 L.Ed. 163 (1929), Mr. Chief Justice Taft said:

"If Congress had intended to give an executive tribunal unfettered capacity for requisitioning investment of capital of the carriers and the purchase of large quantities of land and material in an adverse proceeding, we may well be confident that Congress would have made its meaning far clearer and more direct than in the present meager provisions of the transportation act."

Earlier the Court had ruled that the Interstate Commerce Act did not impliedly authorize the Commission to order a railroad to furnish tank cars for shipping oil. United States v. Pennsylvania R. R. Co., 242 U.S. 208, 37 S.Ct. 95, 61 L.Ed. 251 (1916). Although this case was decided before the enactment of § 15a, the Commission recognizes it as a current precedent. In 1972 the Commis-

sion acknowledged that it "has no authority to require a railroad to equip itself with specified types of cars." I.C.C. 86th Annual Report to Congress 23 (1972).

As the Commission points out, none of these cases dealt with the suspension of rates. However, they unmistakenly establish that the Commission has no general power to control a railroad's expenditures. No provision of § 15(7), authorizing suspension of rate increases, implies that the Commission may exercise, as an incident to suspension, the control over expenditures that Congress has otherwise withheld from it. Lacking statutory authority to exercise this control directly, the Commission cannot accomplish the same result indirectly. T. I. M. E. v. United States, 359 U.S. 464, 475, 79 S.Ct. 904, 3 L.Ed.2d 952 (1959). Nevertheless, one cannot read the administrative record without recognizing that the Commission's orders are a well-intentioned effort to cope with the vexatious deterioration of track and equipment that saps the ability of the nation's railroads to serve the public adequately. We do not judge the wisdom of the Commission's remedy; rather, our sole function is to determine its lawfulness. We conclude that Congress has not authorized the Commission to control a carrier's expenditure of funds as a condition to withholding the suspension of rates. But we do not determine whether the rates should or should not be suspended without the conditions, for that decision rests with the Commission. United States v. SCRAP, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).

Accordingly, we will permanently enjoin the Commission from restricting Chessie's expenditure of revenues, as it has done in its orders of June 3, July 18, August 9, and October 3, 1974, in Ex Parte No. 305. We will not enjoin the Commission from requiring Chessie to report in accordance with its orders. In view of our disposition of the case, it is unnecessary for us to decide the procedural issues Chessie raises.